Good afternoon, all. We will be hearing one case this afternoon, and that is Ares Trading v. Dyax Corp. And we will start with you, Mr. Saunders. Thank you, Your Honor, and may it please the Court. Tom Saunders for Appellant Ares Trading. With the Court's permission, I'd like to reserve five minutes for rebuttal. Granted. So the Supreme Court established a bright-line rule that a royalty agreement that projects beyond the expiration date of a patent is unlawful per se. Let's get the sound check up on this. We'll try to absorb it the first time. That's what we're doing, but we're in front. Yes, exactly. Now, now. Are you good to go? I will say this is a first. It's a good icebreaker. You should make it standard. Oh, no. Apropos cutting-edge technology. Yeah, I didn't hear the echoing at all. Okay, we're okay to go now? Okay, may it please the Court. A little bit. Okay. All right. May it please the Court. Tom Saunders for Appellant Ares Trading. Let's just try to move forward. So the Supreme Court established a bright-line rule that a royalty agreement that projects beyond the expiration date of a patent is unlawful per se unless it imposes different terms and conditions for the period after patent expiration. And the District Court committed multiple legal errors in deviating from that rule here. First, the Court erroneously limited brulette only to post-expiration royalties calculated directly on infringing acts, even though leveraging a patent to capture royalties on uninfringing acts makes the problem worse, not better. Second, the Court erroneously extended the narrow exception for deferred compensation to royalties that accrue and vary after patent expiration. And then third, the Court transformed the rule that you can't have post-expiration royalties regardless of whether the patent is practiced or not into a rule that's allowing an extension of the royalties for an unpracticed patent, contrary to brulette, where the unpracticed patents were not allowed to extend the royalties. So on the first point, on use, the initial mistake the Court's making is it's treating brulette as only applying to infringing acts after patent expiration. And that can't be reconciled with the facts of Kimball, where there was no practicing of the patent. And even in brulette itself, as this Court's supplemental questions asked, with respect to the minimum royalty in brulette, the structure there was that regardless of whether the patent is being practiced, the royalties would be paid. And in fact, there were two sets of parties in brulette. There were the brulettes and the Charvettes. And the Charvettes hadn't practiced the patent since 1952. But as we look at brulette, you can think about the patents being practiced there as either actual or contemplated. But all of that would be post-expiration. And here, the only use, I mean, if we think about use as practicing the patent and taking the value of that, would seem to be at the research phase. Why shouldn't we think about the royalty obligation as accruing and being fixed at that earlier point, even if the amount and the timing is variable? Well, but that's the key point, Your Honor, is it's not accruing and being fixed at that point because it's capturing this value after the end of the patent. Doesn't that mean it's just being calculated later rather than it accrues at the time of use, but it's calculated at the time it can actually be known? Well, but in calculating it later, what you're really doing is you're going beyond your patent term. And rather than just spreading a payment that's sort of fixed for the use during that term out, you're reaching out and you can be capturing value that's coming from some subsequent innovation developments that have happened after the end of the patent term. So, you know, this was one of the arguments that was being put to the Supreme Court in the Kimball case by the Memorial Sloan Kettering amicus brief. And they talked about this dynamic of we have patents that are important in universities for the research phase, and we may want to be capturing royalties later on when there's a commercial product. And the Supreme Court's response to that was to recognize that the Verlotte Rule may stand as an obstacle to that. And then when they articulated the exception for deferred compensation, the example it shows is very carefully chosen to say royalties for calculated based on the use during the patent term and then merely being spread out. But doesn't that beg the question, when is the use? And if use is actually practicing the patent, when has that happened after the research phase? Well, I would take issue with the question of the use that they're referring to there being actually practicing the patent in the sort of technical sense of does this infringe the patent or not. What is your definition of use? I've had trouble from the briefs and from your argument today. What is, you say indirect use, you say leveraging the patents, what exactly is use? Right, it's extracting the royalty in exchange for the patent. So you're saying I'm licensing this patent to you, but I want to be collecting this royalty based on actions that you take after the end of the patent term. And whether those actions are infringing directly or not infringing, they're still reaching out in time beyond any actions you're taking during the patent term and saying I want to capture that later value after the end of the patent term. And that just makes an amount variable. It makes it contingent. But the obligation, the consideration is fixed as of the time that here the FO2 FAB gets assigned, right? Well, the other thing that's sort of different about this license compared to some others that you might see is the CAT gatekeeping that was established. So this isn't just a here's my research tool and go and do what you want with it and I'm going to charge this later royalty, right? They reach out in time and DIAX is required in its contract with us and then includes that in the license to prohibit, areas trading is prohibited from commercializing a product at all unless it takes a commercial license to the CAT patents. So it's forced through this extra step that's directly connecting these patents that really shouldn't be connected to commercialization and saying you can't. If we had tried to move forward, we could have been in breach of contract for commercializing without taking that additional CAT license. But the royalties are not in exchange for the commercial product license or the sub license. The royalty duty is in the actual CLA, the amended and restated CLA. Well, I respectfully disagree that they're not connected because the royalty in Section 4.6 is the royalty on net sales for therapeutic antibody products commercialized by licensee. And under the base of the CLA, you never get to commercialization. You only reach that point if you take this extra license that we're forced to take to the CAT patents. And then that CAT patent license at 4262 of the appendix talks about the compensation for it. And it says this sub license quote shall be subject only the milestone and royalty payments set forth in Article 4 of the collaboration agreement. So this is all tied together. The idea is CAT forced the structure upon DIAC, which then is forcing it upon us as the sub licensee. And what it wants to make sure is that even though its patent has a, you know, certain limited scope, that it's able to reach forward both in time and in the scope of what it covers and being captured royalties on our commercial product. Just to be clear, your complaint is only a temporal complaint. Nowhere in the complaint does it allege patent misuse on a physical expansion or expansion of scope of the patent. Well, that's, I think, that's our response. Correct. It's a brulette problem. And then what we are saying is you don't fix a brulette problem by bringing in another problem, which would be expanding the patent beyond its scope. In other words, it's not an answer to a brulette problem to say, well, don't worry about collecting these patents after patent expiration because they're being collected on something that's beyond the scope of our patents as well. So that's our point. That makes the problem worse, not better. That doesn't fix the brulette problem. So it's not a freestanding total sales fight that you might have during the patent term. It switches over into the world of brulette after the patent term. And if this is recognized as just blanket, this is deferred compensation without any more, because by definition this was used, then what that means is suddenly the most valuable patents you can have are these upstream research tool patents. Because if you actually go farther and do the hard work and take the extra 11 years, as we did, to get to the commercial product, we changed the antibody, physically changed it. Ran through this commercial product. If you actually do that and get that patent, you'll be limited to patent expiration. But if we have this fiction that with nothing more in the agreement, we'll just deem this to have been used during the research phase, then suddenly those patents can have a perpetual scope and become, it skews the patent system towards them. Wouldn't sophisticated parties negotiating these kinds of licenses just put in a provision, not unlike the one here, that has a cap on it? 10 years, for example. Well, I think two responses around it is, one, even if they do, you can have the situation here where it's running beyond the end of the patent term. And then this is a quintessential area where the hands of the private parties are tied by the background rule. The concern here is, and it goes all the way back to the Scott Paper decision in 1945, that even having one commercial agreement out there where the party has tied itself into paying post-expiration royalties implicates the public interest. And so this is a situation where even when the parties would be in agreement on those terms, they would not be allowed to do that structure. And if you're going to have deferred compensation, at the very least, you would need something like convenience of the party language or some structure to get that there. And in this case, there was an attempt to put that language in. That actually came back after the fact and tried to recharacterize the royalty in those terms, and that wasn't added to the product license. And then the other thing I'll say about the deferred compensation argument is I encourage you to look at DIAC's own arguments. You can see in the joint appendix when it's bringing a burlap challenge. And anything DIAC is saying about the CAT patents, those would only be practiced up front in the research phase. And so its own position with respect to the CAT patents and not being applicable to it or not being enforceable in those post-expiration agreements under Burlat is finally inconsistent with any position now that this is by definition just deferred. So the district court made a finding of fact that ARIES did not practice the CAT patents in connection with the development of Provencio. Is that correct? I mean, is that a correct finding? Right. You can assume that for purposes of the case. There was some work on the side, but ultimately it didn't go into that. Why doesn't that finding foreclose the kind of scope or leveraging argument? Well, because we needed someone to practice the CAT patents. And so initially there were conversations between us and CAT. It would have insisted on this product royalty. Eventually the decision is essentially to have DIAC practice the CAT patents on our behalf. But as part of that structure, CAT has locked DIAC into imposing all of these limits on the sub-licensees. So wherever we went to have the CAT practice patents, whether it's directly to them or through DIACs, the leverage is being exerted there to say we want this product royalty on the back end. And then you see that, as I said, in the gatekeeping structure here, because we then get locked in this license to a provision that says we cannot move forward to commercialize without getting the extra CAT commercial license to these patents that we don't need. So, again, the fact that we are not practicing that. That's being passed down to you at this point. You're just in a position of covering DIACs as operating costs, no? I mean, you're not bound to CAT. You have the CAT product license. But the language you're discussing as far as the agreement between CAT and DIACs and being passed down to you, that's being passed down to you as an operating cost, no? No. Number one, CAT's not uninvolved here, right? It is named as a third-party beneficiary in that product license with a right of enforcement. So it links itself through this entire chain. And so what we have is, yes, we are paying royalties to DIACs, and then it's turning around and paying a portion of those right back to CAT. But they're not comparable to just sort of ordinary operating expenses. They were all tied in with the patent and the fact that to get that patent practiced, we're either sort of doing it directly with CAT in the product licenses or DIACs is the middleman there. But it all is in order to get access to that patent up front. It then is extracting these royalties after expiration. May I ask you a fact question? Is there anything in the record that reflects that ARIES ever asked for a flat fee library license or a flat fee research license where it wasn't tied to a CAT gatekeeping requirement? So I'm not sure on a flat fee. There definitely is evidence in the record, and you can see this at 2896, that on the duration provision, there were questions that were asked not just by us but by others in terms of why is this being tied to the CAT patent. And the statement there of the witness who was testifying was that it was not negotiable. And then we also have testimony from a DIACs witness at 4966 of the appendix who's talking about sort of the minimum royalty that they will do and how that has to be tied to CAT. And then on the gatekeeping, absolutely not negotiable, CAT locks DIACs in by contract that it has to impose this gatekeeping on its sublicensees or it's in breach of contract. So it did. It turned around and imposed all of that, which was leveraged on DIAC from CAT and then leveraged on us. But as far as a flat fee, whether with CAT or DIACs, when ARIES was negotiating, there's nothing in the record asking for just a totally different structure as far as gatekeeping, but like a flat fee or some other? I'm not aware of anything in the record of us asking for it or unlike in, say, the Bay Arby housing case where it was being offered. And I don't think the product royalties really weren't subject to negotiation or weren't going to be because they were tied in with the CAT scheme in trying to reach out and get these royalties on the product itself. You mentioned, and it's true, that license doesn't have the term the mutual convenience of the parties, but here we have a district court finding that that's essentially what was going on. And our standard of review there is for clear error, right, in terms of contract interpretation. Right. I don't see, maybe I'm misremembering the finding, but I don't think there's a finding that's separated from the district court's legal errors here. It really wasn't thinking through the line of the mutual convenience of the parties' cases like that. And I think one key point of distinction here is if you go back to Automatic Radio v. Hazeltine, which were a lot distinguished, in that case, when you're talking about mutual convenience of the parties, number one, you're talking about it during the patent term. And number two, there, there was this massive portfolio, some of which maybe became practice, some of which maybe not. So there was sort of an administrative reason for it. That's not the case with the page display libraries here. I mean, you have CAT, you have DIACS, you have ZILMA. Who's to know which patents are being used when the research is being conducted? Right, but only the CAT patents. So the testimony about ZILMA and the others was that they weren't royalty bearing. And so it was really the CAT patent is unique among those because of the gatekeeping procedures and these royalties that get passed down through DIACS. So I think it was pretty clear. And the one thing that was clear is that when you reached the period of commercializing this product, it's unlikely, like, that an upfront patent on page display is unlikely at that point to be practiced. I'm not saying it wouldn't be. Maybe there are side projects that are going on. But it's not like an automatic radio where, in any given product, you could have dozens of the patents being practiced or not. The sort of administrative convenience of that type of portfolio really doesn't translate here and certainly doesn't translate to post-expiration royalty. Well, whether or not the CAT patent is the only one that's royalty bearing, wouldn't there still be some sort of administrative burden in determining which page display is being practiced at what point during the research? I mean, the issue isn't, as far as convenience, it's teasing out what's being used when during that phase, no? Right. And that's what I'm saying. During that phase, which is during the patent term, maybe there's that complexity. But when you jump forward to the phase we're focused on, which is the post-expiration period, then that has dropped away. And what you have at that point was this CAT product license that's reaching out to capture what we're doing and clearly reaching out beyond the patent scope as well. And so that's just not – if we were practicing that in the post-expiration period, there'd be no question there'd be a burlap problem. And so as I keep saying, it's not fixed by the fact that we're not practicing it. Maybe they've forced something unnecessary upon us. The sub-license, by its term, says it's not imposing royalties there. It just refers back to the CLA in terms of what obligations would be owed by ARIES. And there, the royalty obligation is triggered by the therapeutic antibody product. Therapeutic antibody product itself seems to be defined in terms of the preparation for use in the commercial field for treatment or prevention of disease, which contains, comprises, or the process of development or manufacture of which utilizes a DIACS antibody. Doesn't that – those two provisions, when we consider them together, make clear that the parties were contemplating a prior stage where there would be, you know, that it would be utilized. And then royalties are being associated with the product at a later stage. So with respect, the key word in 4.6 that goes along with the therapeutic antibody is the word commercialized. And there's no commercialization. You cannot reach the point of paying these royalties if you haven't taken that CAT product license. So they really are integrated together. And it would be a little bit like me saying, well, I will charge you a royalty for entering my fairground. But the only way to reach that is to ride on my tram, which is ostensibly free. But it's really not, right? It's all tied together because you can't get to the fairground to even pay the royalty unless you have ridden on that tram in the meantime. And so here we have to take an – we cannot reach the point of paying this royalty. It's nonexistent. It's sort of a future contingency in the CLA, in the base license agreement. And what makes it a reality is taking that CAT product license, which allows us to reach market. And so the CAT product license can say, well, we're not imposing any additional costs. But that's because as part of the scheme and part of gatekeeping and part of coming back to require us to do that, they've already anticipated that, set that royalty out in advance, and then taking that license ends up being the prerequisite to triggering it. And see, I'm into my rebuttal time. We're past it. All right. We'll hear back from you in rebuttal. Thank you. Thank you. Good afternoon, Your Honors. My name is Chelsea Loughran. I'm here on behalf of Alphalete IX Corporation. May I please report? May I proceed? Yes. Welcome. Your Honors, I recognize that you actually posed some questions about reach-through royalties, which I actually would like to address in the framework of the issues on appeal here. You cited an article about reach-through royalties, and that article talked about those royalties being, you know, where a patentee reaches through to the sales of the drug product found by the licensee using the discovery tool. That's how the article defines reach-through royalties, you know, notwithstanding the fact that the tool doesn't cover the ultimate drug sales. So that is not this case. Now, in the context of the collaboration agreement here, ARIES royalty isn't even a reach-through royalty because ARIES never actually used that discovery tool. They never wanted to use that discovery tool. They didn't contemplate using that discovery tool. They entered into an agreement with DIACS for services in order to get an unpatented product that ARIES then went and turned into, you know, a successful commercial drug. Isn't my argument at the bottom just a semantic one? So they used the expertise of DIACS to have DIACS do that work with the CAT patents and combined with DIACS's patents and know-how in those libraries. But at the end of the day, that's all assigned back to ARIES. That's correct. In addition to getting the benefit of all of DIACS's expertise and its perfection of its libraries and physical unpatent products, they also got from this deal exclusivity over those unpatent products. And so the idea that, oh, this deal was entered into because of leverage or worry over the CAT patents, when you look at this deal, it was a services agreement. It was an agreement to get an unpatented thing. And for them to then go off and get a patent on the thing that DIACS provided to them. If we accept that they used it because DIACS did and they end up with the fab to work with, why aren't we in the paradigm of just reach through royalty? Why isn't that, in essence, your deferred compensation? So let's skip to that. So let's say, okay, DIACS, in addition to providing everything else under this license agreement, it did use those CAT patents. And so even though I don't think that ARIES was subbing itself for DIACS, there was a whole lot of expertise that went in there and there's ample district court testimony over that. Let's say that DIACS's use is sufficient here. Well, again, as we've talked about in our brief and as the district court found, all of that use happened during the term of these patents. And in a BRULET world, BRULET is concerned with charging royalties for use of patents after they expire. And so even if we're going to implicate DIACS's use of those patents, as the district court found and ARIES has found, said, you know, made no point that that was clear error, all of that use happened long before those CAT patents expired. In fact, it happened long before the parties engaged in the CAT gatekeeping and seeking the commercial license. That was an upfront, as your honors just noted, a research phase use of research patents during the term, and the parties engaged in negotiations to assess what the best way to pay for that was. And as this article says with respect to reach through royalties being non-violative of BRULET, they agreed to pay to defer that compensation for that use during the term out until there were commercial sales on the product. We seem to be breaking some new ground in thinking about what use means in the context of licensing agreement like this and in this industry. So where we have in the way this agreement is structured, payments, they're contingent even in their existence post-expiration. The amount is determined post-expiration. And there is, as well, the need for gatekeeping and presenting this to get CAT's approval in the midst of the process before even Phase I trials could go forward. Why isn't that integration enough to see it as a sort of continuous use? So that is a great question, your honor, and I think it gets to the difference between the parties' views on use. And what I would encourage your honors to do is to come back to the narrow, narrow rule that was articulated in BRULET, the reason why that rule survived Supreme Court scrutiny in the Kimball case, because it is such a narrow rule. It is not an expansive rule about use being in exchange for this thing or that thing. The rule as articulated by the Supreme Court narrowly is a court may only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem. If so, no dice. Now, what Mr. Saunders says is that use, Dyack says that that use means calculated directly on infringing acts. No. In the BRULET case itself, BRULET was paying on pounds of hops harvested by the machine. The hops themselves not patented, but the hops once harvested were indicative of the use of the patented machine. But that's the question that we put to you because there's also a flat fee that was built in there, and that was paid even when there was no use at all. That is correct, Your Honor. When we look at the BRULET case, basically there were two options for paying for use. You were a very successful farmer, and you made more than 200 pounds of hops, so you paid on the actual pounds that you harvested. But maybe you were a less successful farmer, and you didn't cross that threshold. There was a minimum payment. Even that is still based on use. It's just the fact that you only use a smaller amount than that threshold. I think what BRULET was getting at was if you were a farmer and those patents on those machines expired, and you were still using that machine, you were still paying royalties, and that is something that is forbidden under that rule. But as the facts are recounted in BRULET, there was at least one of those farmers that didn't use it at all. So how do you reconcile that with your argument as to use? I think what you have to look at is how the parties negotiated those agreements. The idea was to purchase the machines and then to pay based on use. It may have turned out that one farmer or a farmer never used that machine. Maybe that farmer would sell it back because why pay for nothing? But those royalties, the agreement provided, whatever else it may have provided, it absolutely provided royalties on post-expiration use, and therefore that is why BRULET came out as it did. Then Kimball looks back on that and says that is an appropriately tailored, narrow, and workable rule and affirms, again, based on the simplicity of being able to look at an agreement and say there is an aspect of this agreement that is going to require a royalty after expiration of that patent. That is unenforceable. The agreement governs, not whether there was eventually actual use or not. It's under the terms of the agreement that the royalty being paid for. That is correct, Your Honor. Again, to bring it back to the CLA here, when you look at what actually Ares is paying for, as Your Honor aptly noted when you follow through all of the provisions, they were paying for a physical product that they got from DIACS, not for using any of the patents that were listed in that agreement. Would you be able to articulate in a way that would, you know, satisfy Ares why Ares says that this is post-expiration use and then explain why you think that's wrong? So I think what Ares is saying is that we have to look at sort of the gestalt of everything that's happening and say in our minds, you know, hey, what does the licensee actually fear? You know, what does the licensee actually want? What does the licensor actually want? And if it's sort of an exchange for let's just throw it all into the hopper, you got some patent licenses, you're paying something, you know, we're just going to use sort of contract principles to say actually, you know, you're paying a royalty for everything you got, then, you know, then in that world, things like gatekeeping and other provisions of the contract may implicate Brulot after some of those patents expire. The problem with that, again, is that that's not what the Supreme Court's test was, based on the facts in that case and in Kimball. You know, Ares likes to use the per se rule, but when Kimball actually reflected on Brulot, it said, you know, that court held the agreement unenforceable, unlawful per se, to the extent it provided for the payment of royalties accruing after the last of the patents incorporated into the machines had expired. So I think Ares is trying to sort of advance the gestalt of the agreement argument. Two things about that. That is not the Brulot test as articulated in Brulot and in Kimball. But second, as your honors, you know, will note from the district court's opinion, that is the test. If we are looking at sort of everything that Ares got in that agreement, it also got licenses to unexpired patents, and those were the DIAC patents. And, you know, one of the arguments Ares makes is the path to commercialization required us to take that sublicense to the CAT patents. But if you look at the commercial provision in that agreement, it includes a license to those DIAC patents as well. So if we are in a world. Okay, Kimball, we got what you're getting at. Yes, well, those patents are unexpired. Yes, exactly. So if we are in a world and under Ares, you know, tests where you sort of have to look at the totality of the circumstances, you know, and everything that Ares got, then those DIAC patents were also included. The district court engaged in ample fact findings showing that those patents were just as important as the CAT patents, and those patents remain unexpired today. Does the date keeping and the product license and sublicense also convey value to the licensee in the sense that a licensee might be hesitant to engage in these agreements knowing that they're non-exclusive, someone could follow on and license the exact same fab? That is absolutely correct, Your Honor. I mean, the origination of that agreement was actually one to sort of protect the parties from, you know, at a certain point in time, and so to avoid somebody, you know, investing tons of money into developing a product that someone else is already treading on, we wanted to keep things, my understanding is that CAT wanted to keep things separate. But even, you know, even the district court's consideration of date keeping was instructive, right? That date keeping had absolutely nothing to do with using patents, right? I mean, again, it occurred after the research phase. It didn't preclude ARIES's advancement of this in this case. The record showed that there were parties that were frustrated by the date keeping process, but because of the value that DIACS brought to these agreements, they were willing to do these deals anyways. And, indeed, there were efforts to try and say, well, if you go for the CAT date keeping sooner, you know, maybe the risk of not passing is less, you know, but ARIES didn't take any of those options. You seem to be asking us to break the rule-out analysis down into two different phases and superimpose two different phases on the sequence of events here. Another way to think about the argument that ARIES is making is that what's incorporated into the patent is – the right analogy is that the FAB 02 and the initial use of the patents is incorporated into this whole process, and it's one continuous process rather than breaking it out to here's the development and manufacturing, and that results in one thing, and then comes the commercialization phase, and at that point, there's no more use. Where do we get authority to break down the sequence of events like that into two utterly different parts of – you know, really two different rule-out analyses? Yes. So I think that if we are following, again, following the narrow rule of Bruot, it is not – we're not talking about a research phase and a commercialization phase. We're talking about, you know, a patent is a right to exclude, right? A patent is a right to exclude others from doing what you have patented. You have – the way the parties, you know, usually set that up is you pay me some money so I can gain access to what you could otherwise exclude. You're able to do that with whatever leverage you have until that patent expires, but if you can go and use that patented invention free of charge after that patent expires, then you are not violating Bruot. And so, you know, you may think of the FABs here as a research phase and a commercialization phase, but if Ares were to go and, you know, practice CAF patents today, it never paid a royalty for the practice of them to begin with under the CLA. It certainly wouldn't be paying a royalty for the practice of those CAF patents once they've expired today. Again, focusing on the rights that a patent actually conveys, which is basically a fence around, you know, a piece of property. When that fence comes down, as long as you can then access that fence without an additional charge, you should be okay. Another way to think of it, Your Honors, is Bruot does prohibit, you know, some of the – there are circumstances, deferred compensation circumstances that Bruot does prohibit. Think about if you have a 20-year patent and the parties say, I'm going to pay, you know, $5 per use for 20 years, the parties are like, oh, that actually is not great for me. Let me pay $1 per use for 50 years. Bruot says you can't do that, right, because you're still paying on use after expiration. Here, again, where use occurs entirely within the period of the patent, and the parties say, as the district court found here, the most convenient thing, no party is going to do a deal where they have to pay for everything up front, you know, you push the calculation of that value out past expiration. But the actual royalties are being accrued when they're being used, when you are accessing that, you know, that field in which the patent, you know, puts a fence around. Given that the contract with Ares, in fact, didn't have the deferred compensation and convenience of the party's language, are you the proverbial Justice Harlan bad drafter here that just happens to, by accident, violate the law? So I don't think there's any case that says, that requires that you set out exactly in your royalty provision, this is deferred compensation. I think the district court engaged in a whole lot of fact-finding around that, including, you know, what the royalty actually was on, what the royalty-bearing product was on. You know, and the reason why this deal happened, which was that Ares didn't have the ability to practice this patent, to do phage display and wanted Ares' expertise to do it. So, you know, I don't think that, you know, the district court appropriately found this to be deferred compensation for that work, even if the license agreement doesn't say this is deferred compensation. Similarly, with the convenience of the parties, you know, later on in a different agreement, you know, DIAC, somebody at DIAC wanted to insert some convenience of the party's language, you know, as it didn't appear here. Again, I don't think convenience of the parties is inapplicable to the law. It's applicable to some of these other patent misuse doctrines that were highlighted in your honors article. But, you know, even if you're going to say, oh, you know, we want to be able to see was this a convenient thing for these parties to do, it doesn't have to appear in the agreement. If you look at the district court's fact finding, you know, Zenith says if convenience of the parties rather than patent power dictates the royalty, no misuse. DIAC had no patent power. It was not going to deny Ares a license to the CAT patents. In fact, Ares had tried to go out and get a license from the CAT patents directly and left that deal on the table. As you noted, there's no evidence that Ares proposed a licensing arrangement to pay up front. DIAC was found to be sensitive to the needs of its collaborators. DIAC's witness said, you know, we negotiated these with respect to, you know, did they want to pay a higher royalty and a lower up front, a higher up front, and lower royalty. There was a whole bunch of fact findings, including that, as I said, a total compensation package for its work was appropriate here because no pharmaceutical company could or would pay the full cost of drug development up front. Why shouldn't we think about the methodology being incorporated into the ultimate product in the same way that the patented invention was incorporated into the pot machine? And the payments, then, are royalties that go to the benefits of the patent. I see what you're saying. So I think what we want to do here, Your Honors, be very careful about what patents actually cover, right? So the FABs may have been discovered, you know, by DIACs executing on its expertise and, you know, and using patents that it had gone out and obtained FTO for itself. But those FABs were not something that, you know, that anybody could say, oh, I'm going to sue you on these, because I think, as the district court found, CAT never had patents covering those products. So you may be able to think of it as, you know, okay, it came about through, you know, DIACs' FTO and DIACs' use of those licenses, but CAT didn't have a patent where it could then say, you know, you didn't follow gatekeeping. I'm going to sue you on this FAB, because one of these patents covers that FAB. Would that be an expansion of the patents that were at question, that were at issue here? It would. It would. The district court very clearly found that, you know, everybody knew, and that the CAT patents, you know, were related to doing the phage display, the libraries and methods of using them. You know, DIACs' witness testified CAT didn't have, you know, patents to binders. And so when this deal was executed, the idea was DIACs had FTO and it was going to do the work. Everybody agreed on that. That was the plan as articulated in the CLA. And that also, ARIES would then be able to go and get a patent on the resulting binders, because CAT didn't already have a monopoly on that area of this technology. Does BRULAT by its own terms tell us that variable royalties can't constitute deferred payments for something that was pre-expiration? I don't think it tells us that it can't. I think BRULAT leaves that exactly open. I think BRULAT says you can't defer compensation by extending out royalties on use, but, you know, when you read BRULAT and then you read cases like Housie, there's a, and indeed the article that you all sent around, there is a difference between accruing a royalty in the post-expiration period for using a patent and accruing a royalty on a sale of a drug that's not covered by that patent based on how many sales you make, how good of a drug that is. That is just the value, just the calculation of the value of the use of the patent in the pre-expiration period. I don't think BRULAT, BRULAT does not say that's not allowed. I think BRULAT says that's entirely permitted because, again, the party that is going to the licensee is then free to use that patent once the patent expires. But it does say that royalty payments for post-expiration period are by their terms for use during that period and are not deferred payments for use during pre-expiration period. So that's exactly the hypothetical that I was saying. Royalty payments for use in the post-expiration period, meaning if I, you know, a royalty, BRULAT using his machine after that patent expires and paying a royalty on the hops, that's by definition a use in that period, the post-expiration period. No dice. That is not allowed. But if the use of the patent, the execution on that patented monopoly occurs when it's enforced and, you know, the value of that use is simply being paid on something completely different, not use of that patent later on, that is okay. Because, again, we are not impinging upon the licensee's ability or anyone in the world's ability to use that patent the day the patent expires. It sounds like you are asking for an infringement-based test. We're supposed to have simplicity itself. We've got a categorical rule here. Doesn't Ares' approach make that a much clearer, bright-line rule? I would submit that it does not, Your Honor, because, again, you can look at what the royalty agreement, the royalty provision in the agreement provides, and you can say, is this requiring, you know, is this provision a provision for using a patent? And so am I going to have to pay for using that patent after the patent expires? That is the extent of Brulat. That is a narrow and very simple rule. Ares, by contrast, would bring into play all of these other things about leverage and a path to commercialization. I mean, I think it's instructive that when Brulat was actually faced with this, right, patents that were incorporated into the machine and then patents that weren't, Brulat, the Brulat court, set those unincorporated patents aside because that's not what they were focused on. They were focused on payments for royalties for using an invention after, and those patents wouldn't have implicated that. Now, Ares says, well, you know, flips it on its head and says, well, those patents didn't work to extend the term. I mean, under Ares' test, we would have to have some evidence, I suppose, that the Brulat court said, well, we know that Brulat didn't care about those patents, didn't feel leveraged by those patents, but we don't. Brulat may have had a side business where it did care about those patents. That doesn't matter in the Brulat analysis because we are very narrowly focused on are you paying a royalty for using a patent after it expires? If you've got patents in there that haven't been practiced, Brulat court aptly sets them aside and says, let's look at the patents that are actually being used. But here they are being used as a necessary part of the creation of this ultimate product. That is correct. If we accept that DIAX's use matters, and again, Ares hasn't cited any case in there. There were no cases in the article or any cases we could locate that say, yes, DIAX's use as a proxy is perfectly fine to have this analysis extend to it. But if we say DIAX's use matters, then once again, that use happened before those patents expired. All we're doing by having a royalty on commercial sales after is executing on the value that the parties agreed they would pay after DIAX's pre-expiration use ended. And frankly, value that Ares, when doing this deal, basically got the benefit of saying, well, if none of this works out, we don't have to pay that royalty. If your pre-expiration use ends up not yielding a drug, we don't owe you that royalty at all. But if it does, that's great. We agree to pay you this 5% for what you did for us during the patent term on the resulting commercial sale. To be clear, the use was in discovering the fab, but the phage display is not used in producing the fab. That is correct. It is not like phage display gets used every time Ares makes a new batch of drugs. It was literally just used. And the pioneering technology, frankly, I mean, there were noble prizes for this work, and DIAX built a whole business about perfecting this expertise. But DIAX took that PD-L1 target, used its expertise, its libraries, got those fabs, the best ones that it could. Ares knew it was going to get good fabs from DIAX, 167 of them. Gives them to Ares under this license. Ares makes five amino acid changes, puts them into clinical trials, and now has a multi-hundred-dollar-a-year drug based on that work that DIAX did, and it agreed to pay a royalty for that work. Bruat has nothing to say about that. Bruat says that's fine. A couple questions ago when you were answering some of Judge Krause's questions, you were discussing the patents that were used and the patents that weren't and the imports of that. But that seems to contradict your earlier statement that the contract controls, and it's purely a question under the contract what the royalties are paying for, regardless of whether or not they're actually used. Can you reconcile those two arguments, or are they inherently contradictory? Nope, nope, they are perfectly reconcilable. Again, you look at the contract, and the contract was royalties on hops, royalties on hops harvested by the machine, which, you know, again, the hops weren't patented, but they were indicative. They were direct representation of that use. So the royalty provision itself provided for use of those patents, and the farmer was required to pay that royalty after expiration. There were other patents that were unexpired that weren't part of that machine. They were related to something completely different, but because Bruat cared about am I extending a monopoly term because of this royalty, which is on use, it set those patents aside. Even though they were unexpired, they were still enforced, and said, no, I focus on what the royalty provision provides for, provides for use of these patents, and the farmer was going to pay a royalty if it used those patents after expiration, and that's why that royalty was unenforceable. And your main point is that the royalties here were not based on use. That's absolutely correct, yes. How will you have us define the term use for purposes of Bruat and Kimball? Well, I think, you know, I mean, I think the way Bruat, I mean, I would have you define use as it applies to what the thing here is, which is a patent and what those rights confer. I mean, if you look at what Bruat says about this, it says the right to make, the right to sell, the right to use may be granted or conferred separately, but these rights, these rights, we're talking about patents, those rights become public property once the patented period expires. Use is synonymous with practice. Practice, yes, exactly. I mean, again, the Hobbs didn't directly practice those patents, but they were indicative of use or practicing of those patents, yes. Part of the court's concern, and we can attach what we made to it, is also the policy and the economic reality of the situation. And what about the concern about giving so much control over the value to that, you know, the initial developer of the research product and the amicus brief that your adversary mentioned? Yes, so I appreciate that there are certainly policy concerns here. I actually think that they weigh in favor of this narrow applicability of this rule, because, again, we're not saying that research patents are somehow exempt from Bruat or anything like that. If you engage in a license for a research agreement where you're paying for the use of that research patent and that is happening over and over again and the agreement is, you know, sort of extends out where you're still paying for use of that research patent after its expiration, that is violative of Bruat just as all of these other rules are. But is there any limiting principle inherent in your argument? For instance, here it's 10 years or whatever is longer, the life of the CAT patent, but what if you said in perpetuity? They accrued before under your argument, and the royalties are due in perpetuity. Is there any limiting principle of your argument on that deal? Well, you know, I mean, I think as the district court found, you know, and the parties who are negotiating deals around research tools tend to set these at standard rates about, you know, sort of what we can actually get in the process of engaging an agreement and a negotiating agreement. But, again, if you are paying for something different, not for using a patent or not for, you know, sort of the use of the patent but for, you know, service an unpatented thing to develop a drug product and so there's no concern about, you know, sort of the extending the temporal rights of that patent because you're not paying for that, then, you know, that developer should be able to charge a royalty for that thing, which is not the patented thing for as long as that person, you know, can negotiate for. So the limiting principle is just the parties negotiating positions, so it's more like Listerine in the argument or in the article? Yes, so the limiting principle is the limiting, yes, exactly. The limiting principle is, well, the patent itself limits you, right? If you're practicing the patent, you're limited 20 years. If you're not, then it's, you know, it's how well you can negotiate for, you know, for the value of what you've brought to the table. And, again, DIACS, the district court found DIACS brought all of this value to the table. It was not an insignificant research tool. DIACS gave ARES the thing, like the antibody binders from which it made its drug. I asked a couple of minutes ago if use were synonymous with practice. You said that in Brillat, the hops were indicative of the use or practice. So can you just explain again how Beventio here isn't indicative of the use or practice of, I guess, the CAT patents? Yes, so, again, I think the idea is in Brillat, the royalty itself was, you know, hops made by the patented machine, right? They were paying for, you know, the way they were calculating it was not somebody looking at the farmer and saying, you know, you just use that machine, pay me a royalty. It was you've sold this many hops. So there's very tightly, you know, it was not the hops themselves not patented, but they were synonymous with use. Here, Beventio is a drug that's separately patented, is very far removed from these patents, which, again, relate to, you know, antibody libraries, a research tool used at the very beginning of this process, you know, that, again, was used only pre-expiration. I appreciate the way that the parties are calculating value extends out to the drug, but it is not like the hops in Brillat, which, again, that royalty provision was hops used by the machine, the patented machine. Would it have been possible to develop Beventio without the CAT patents, if they never existed? Yes, I mean, as the district court found, and, again, perhaps your Honor is getting at leverage or coercion, ARES could have gone off and executed on different technologies. You know, the district court said there are other ways to do this, you know, to find antibodies. There were transgenic mice, humanized mice. I mean, I don't mean other theoretical ways, but the way that it actually happened here, if you remove the CAT patents from the equation, could ARES have ended up with Beventio? It could have. Yeah, I mean, I think DIACS, you know, I mean, DIACS had and developed phage display, as the district court found. It got a whole suite of IP on that, right? So, you know, there were overlapping patent estates, and, you know, and I think, again, to its credit, DIACS's expertise of its own IP allowed it to go and secure FTO for itself. But, you know, but the development of Beventio stretched far beyond those. The reason why this isn't brought up is because of the independent work that DIACS did. Yes, I mean, the district court found that ARES was paying a royalty for DIACS's work. Which sits in between that DIACS's work, as it were, sits in between the use of the CAT patents, or non-use, I guess, and Beventio. I think the way that the witness at trial put it was DIACS had a bunch of costs that it had to navigate, right? It had to secure lab space and its own FTO, and it built those into, you know, to its royalty agreements. You know, and so, you know, again, in a world where we're saying you could throw all of that in and say all of that is what ARES was paying for, that encompasses unexpired patents. But Bruat is a much narrower thing. It is about, you know, it is about the use of patents and whether you're getting charged to use those after expiration, which never happened here. If we're thinking about this as the know-how and what DIACS itself contributed, that doesn't necessarily foreclose royalties from also attaching maybe a lesser percentage if there were a remand and reformation, right? It's not an all or nothing. If it's a hybrid, if it ends up being viewed as a hybrid license, it would just reduce the percentage, right? I mean, in the hybrid license context, yes, you do want to see some evidence of a reduction, but this is not a hybrid license. Again, you look at the royalty provision here, and it is not for, you know, practice of tax patents or, you know, for all of DIACS's know-how. It is for binders that DIACS provides to ARES. You could characterize the machines in Brulot as tying the patent to, I'm sorry, tying royalties to what the patented device successfully produces. And with that paradigm, doesn't that also map on in the development of pharmaceuticals to the research patent device, to Judge Porter's question, being integral to the ultimate development of a successful product? That's the output. Well, I note that you're going to use the word tying, and I think Brulot specifically set tying as a different doctrine, and tying has never been implicated here. Again, it hasn't, and so I'm not an expert on tying. My understanding is that to make out a tying claim, you have to actually show market power and a whole bunch of other things that were not implicated in this case. So, again, I come back to this is a Brulot case. It's about a very narrow rule. I mean, Brulot survives at the Supreme Court in Kimball because Marvel argues it is a very narrow, workable rule that requires only that, you know, royalties, where only where royalties that are being paid for use of the patent after it has expired are being paid. So, there may be other tying considerations. Again, there's no allegation of that here, and I don't think there's any sort of market power concerns. What was the post-expiration use of the patent in Brulot? What was it? The post-expiration use of the patent in Brulot was, you know, using the machine to make hops, and the farmer, once it used the machine to make those hops after the patent expired, had to send a royalty to Tice, and that runs afoul of what patents are. But for the minimum, it was determined by the contract, so there was no actual use by somebody? In certain circumstances, yes. You would look to sort of what the royalty provision provided. There was a minimum for minimum use, some of which was zero, but, again, when you look at the royalty provision there, it certainly did provide for post-expiration royalties on use. So, for the hops manufacturer, I guess, to avoid the Brulot problem, he would have to build all the revenue that he seeks into this sale of the machine in the first instance. No more royalties. There are ways that the hops farmer could have avoided Brulot. That's certainly one of them, right, an upfront cost for, you know, and, again, I think when you get into questions about convenience of the parties, that is not a convenient way of doing it. But, yes, you could have said, well, I think that over the life of this patent, you know, you're going to make a billion dollars on hops, so I'm going to charge you a billion dollars for this machine. Thank you. I'm sorry, I went over my time. Thank you very much. Okay. Mr. Saunders, could you start out speaking to the extent that we have, looking to what the latest running patent covered in the parties' agreement is? How could it be that it covers cat patents but not DIACs? Because of the structure of the cat gatekeeping and the way that that was tied. So you have this sort of upfront license grants, but the actual cat patent is tied to the royalty provision. You see this in the expiration in Section 4.9, where it's only the last valid cat claim, not the others. And you see this in the special gatekeeping and the need for this mandatory additional cat license that ties it together as a factual matter. And then the problem with their position is they're taking the unpracticed patent in brulette and turning it on its head, right? If an unpracticed patent that's still in force could extend under the last patent to expire, then the brulette decision would have come out differently. There was an unexpired patent there. And so when Kimball talks about the last patent to expire, the only thing it cites for that proposition is brulette. It wasn't in the process of that overruling brulette on its facts. And so you don't allow an unpracticed patent to further extend the royalty. It ends up being that, you know, regardless of whether it's practiced or not, if you're trying to get post-expiration royalties, that's problematic. And you don't fix that problem by coming in and saying, oh, well, I have this unpracticed patent, and I want to extend the royalties. And just step back. Big picture, no one is disputing that DIAC is entitled to compensation. The question in this case is undiminished compensation. So even after the CAT patents expire, there is no step down in the royalty rate that's normally required in cases like this. And in terms of what the royalty is for, the argument of, oh, this is just, you know, the royalty provision immediately says it is just for a particular sort of substance that was produced using the patents. If you look at anything after this argument, look at Appendix 4728. That is DIAC's own brulette arguments in its dispute with CAT. And when you look at the CAT license, we have the same structure here in terms of that royalty provision is framed in terms of the therapeutic antibody. But the distinctions we're hearing today are not being made by DIAC itself in its focus on use. They are practicing the CAT patents. They've incorporated the library. They've exchanged through their exchange of patent licenses, essentially expanded DIAC's library to include CAT's patented material, right? Right. But their test today that you're hearing today is it has to be post-expiration use of the patent, by which they essentially mean post-expiration infringement. And they're in connection with those commercial sales of our product on which the royalty is being paid. There's no post-expiration infringement or use of the patent. And with respect to how all of these provisions fit together, remember here that brulette itself said we need to have clarity, right? If the royalties had been divorced from the patent and no wise subject to its leverage. The Ninth Circuit in Kimball says we know what the leverage here. It wasn't the patents. The patents had been deemed non-infringed on summary judgment. You ended up with a 3% royalty. There was a contract claim that had a 3.5% royalty on a jury verdict. It knew what the leverage was, but it said even with that, because these patents are in the mix, we can't say what this would look like if they were subtracted. The Seventh Circuit in the Meehan case said it's the lack of clarity that's dispositive here. And case after case, in applying this rule, has looked for the post-expiration step-down to provide that clarity. And here, we don't just have an agreement that says, here you may use these compositions we've given to you. It also contains a patent license, and it also contains a provision that says you must get a further patent license to the CAT patents if you want to commercialize. And so if you can't tell how that all fits together, the clear message from Brulotte is there could be patent leverage. And that can be the dynamic where you take the patent and leverage it out to capture that royalty, even on a product that is not itself a patent. Do you agree with Ms. Loughran that use, as that word is used in Brulotte, means practice? Use means practice. No, because of the minimum royalties in Brulotte, right? The Charvettes, after 1952, did not use the hop picking machine at all. From 1953 for the next four or five years, they didn't even have hops in their field. They had torn out their hops field, and they were still being required to pay minimum royalties. When they finally began planting hops again, they used a stationary machine. So they never touched that machine for years and were being told, you have to pay royalties on this because the patent had been leveraged not just to capture these royalties on the use, but to capture minimum royalties regardless of whether it was used. And it really is the same principle here in terms of reaching out and getting our product royalties. You could think about that as either the actual or contemplated use on a forward-looking basis. And here we're talking about a use in a patent concern at a specific time at the research phase pre-expiration. Well, I'm glad you asked that question because if the test is sort of hypothetical or contemplated future use, then we don't need to worry about the district court's finding that we didn't use it because we could have used it in the future, the cat patents. In other words, if it's just, you know, oh, the Charvettes in the Berlant case, they were paying the minimum royalties, but in theory, they could have been using it and paying those royalties. Well, in theory, we tomorrow could use the cat patents for something, and we are licensed under the same agreement to use the cat patents, and so it would all tie together. So I don't think that you can distinguish Berlant and what it was decided on those facts in Kimball where there was never any use of the patent at any point in time. But if you do that tomorrow, you're in a different position vis-a-vis Berlant, right? Going forward, if you're going to use the expired patents, you could easily invoke Berlant. But here, we're looking at a particular product where the use was at a, as I said, at this particular pre-expiration time. But going forward, I mean, aren't you in the same position as any member of the public with the ability to use the now publicly available, previously protected, you know, cat patents? Right. The same thing is true in any Berlant case. When it was expired in Berlant, they could use the hot picking machine. I mean, anybody could use it, but you still have a royalty obligation that's in place, and you still had a royalty obligation that was originating in an agreement that had the patent license that was granted there. And so that enough is to put in this world. And as Your Honor pointed out, in the hybrid license cases, the courts have demanded clarity. There's no answer to say, oh, well, DIACS is bringing other things to the table. We're not saying they can't be compensated for that. We are talking, as I started, with an undiminished royalty that assumes the value here is no different on the day that the cat patent expires than before. If Berlant's use is broader than the technical practicing, then how do you know where it stops? I mean, a creative lawyer can always figure out some way to derive benefit that you might characterize as use. Well, we don't need to go any further than knowing that this was a patent license. In addition to other things, but we have licensed patents here. And so the way this is generally operationalized is when you have a patent license and you have post-exploration royalties for a patent license, courts need to see some certainty that they are accounting for the fact that the patent has expired. And that is almost always done through a step-down royalty. And then the court can have the assurance that the parties negotiated this, they separated out these streams, and you had a interim patent royalty, and then you had a post-term royalty for everything else. Deferred compensation is a permissible way to structure the license. So how would you distinguish then where you can do that and where you can't? Is it because the royalty is a variable royalty as opposed to a fixed amount? Correct, Your Honor. You would be, as far as I'm aware, the first court ever to say that a variable royalty fell within the deferred compensation. Is that really right? I mean, isn't that where automatic radio and DENIS radio come into play? Because they are looking at later royalties, variable royalties based on sales, but treating them as deferred compensation. No, no, no. Those are within-term cases. So automatic radio, Brulat distinguishes it, and that's because there's sort of rules for when you're within the patent term. But once you leave the end of that patent term, when Brulat talks about deferred compensation, I think Justice Kagan very carefully chose her example based on the actual use. So you are able to sort of fix the value. You could know at the end of the patent term exactly what value has been accrued, and then it may be that the payments are spread out over time. But once you leave the end of that patent term and you don't know what the total payments are going to be because they're going to go up and down with market conditions afterwards, then at that point you are projecting your patent past its term and you're capturing things and technological developments that may be captured. Isn't there a difference between discovery tools and actual use of something that's patented? For instance, the value of a discovery tool is in the discovery, so that while the value of sales is temporally limited to the life of the patent, the value of sales is not temporally limited for something that's discovered because the value is not derived from incorporating the patented technology into the product sold, but rather from the discovery of the product itself. The value is not tied to incorporation into the product. The value is the discovery of the product itself. But the ability to practice those patents, or in this case practicing them on our behalf during that discovery period, it still ties back to the patents. And if you have any question about the value here, if you look at 5712 of the appendix, that's the library license agreement that was granted to Merck under separate negotiations, and what your honors will see is the basic structure of the agreement is the same. In other words, that's the one where Merck could do its own work under these patents coming from DIACS before the agreements all got merged together and consolidated and amended. And so you'll see when they were, the structure when they were licensing just the patents for Merck to do the work, and the structure when they were doing the work, practicing those patents on our behalf, is the same structure of provisions. You can go match them up, you know, large sections word for word there. And so I think that's another telltale sign that the patents here are the value and the ability to practice them, and to the extent there's... Because they'll discover something of value. Because they'll discover something, and if those are the patents, if we end up with some categorical principle that those discovery patents are exempt from the Berlac rule, then we truly have turned the patent world on its head, and the least valuable thing you can do is complete the search and do all that other research and get to the therapeutic product, and the most valuable thing you can patent is the new microscope and the new assay, sort of something up front, because as your questions were teasing, we have a limit that the parties negotiated here, but there's no limiting principle to the rule that's being offered here on research tools. So you could end up with perpetual royalties, and you can think of it, say my patent is for erecting your telephone poles or laying your fiber optic cables, and that's used during the patent term, but if I then say I want a perpetual royalty for every time you transmit data or serve all sorts of things outside my patent, what we end up with is a series of dead-hand provisions where people are reaching forward into the economy of the future and continuing to take their little cut there in a way that wasn't contemplated by Congress. Jay Porter asked the question about, well, in Berlant, is the only way to do this, to structure it as just an up-front payment? No, you can recoup your value during the period that Congress has provided. You can charge a royalty, you just have to subtract the patent royalty when you hit that limit Congress has set, and that is what Berlant is operationalizing. You referenced DIACT practicing the patent on your behalf. What is your best authority as that big a use that you can claim? It's not, I mean, I think that is a novel set of facts. I do think that what matters here is we then get the patent license as well and, in fact, have to take the patent license because of TAT gatekeeping. So it's not a situation where it's just they've gone out and practiced the patents on their own and are producing a product. It's all part of an integrated agreement in which we have to take a license ourselves and in which, when I say practicing on our behalf, the sort of fruits of that labor then come back to us as ownership and we have agreements that are, I can't get into the details in open court, but they're covering costs along the way and you can see all the milestone payments and other provisions in there to make sure that they're compensated for doing that on our behalf. Okay. Well, we've gone over time, but we appreciate the very insightful and helpful argument today as well as the excellent briefing from the parties. We'd ask that a transcript be made and the parties share the cost and we will take the case under advisement. Thank you.